# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CAROLYN LEVERETTE-RODRIGUEZ** | **CIVIL ACTION NO.** |
| **Plaintiff,** | |
| **VERSUS** | |
| | **JUDGE BARBIER** |
| **BP EXPLORATION & PRODUCTION, INC.** AND **BP AMERICA PRODUCTION COMPANY** | **MAG. JUDGE CURRAULT** |
| **Defendants.** | |

**Related to:** 12-968 BELO
in MDL No. 2179

## BELO COMPLAINT

COMES NOW, Plaintiff, CAROLYN LEVERETTE-RODRIGUEZ by and through the undersigned counsel, hereby brings this cause of action against BP Exploration & Production, Inc. ("BP Exploration") and BP America Production Company ("BP America") and hereby states as follows:

## INTRODUCTION OF PARTIES

1. Plaintiff is a Natural Person of the age of majority, who currently resides in Lynn Haven, Florida and as such, is a citizen and resident of Bay County, Florida.

2. Plaintiff worked as a Clean-Up Worker[1] for the BP Deepwater Horizon Oil Spill ("Oil Spill") from approximately May 2010 to September 2010 and as such, is a Class Member as defined by the Medical Settlement Agreement (the "MSA").[2]

---

[1] MSA § II.Q.

[2] Deepwater Horizon *Medical Benefits Class Action Settlement Agreement*, *as Amended on May 1, 2012*, MDL 2179, Rec. Doc. 6427-1 (May 3, 2012), § I.A; § II.EEE.

3. Pursuant to the terms of the MSA, Defendants herein are BP EXPLORATION & PRODUCTION, INC., and BP AMERICA PRODUCTION COMPANY (collectively "BP Defendants"). BP Defendants are both incorporated in Delaware with the principal place of business in Houston Texas.

## JURISDICTION AND VENUE

4. This is a Back-End Litigation Option lawsuit ("BELO") for Later Manifested Physical Conditions ("LMPC") filed pursuant to the terms and requirements of the MSA.[3]

5. This Court has jurisdiction over this matter pursuant to 28, U.S.C. § 1332, because all of the parties are diverse in citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Additionally, this Court has Jurisdiction based on Federal Question under 28 U.S.C. §1331, in that Article III, Section 2 of the United States Constitution empowers the federal judiciary to hear "all cases of admiralty and maritime jurisdiction."

7. This Court also has jurisdiction pursuant to 28 U.S.C. §1333; as well as the Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to "cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land."

8. The Eastern District of Louisiana has and retains jurisdiction pursuant to the MSA and approval order thereon. "[T]he [c]ourt retains continuing and exclusive jurisdiction over the Parties, the Medical Benefits Settlement Class Members and this Medical Benefits Class Action

---

[3] MSA § VIII.G.

Settlement Agreement, to interpret, implement, administer and enforce the Medical Benefits Class Action Settlement Agreement in accordance with its terms."[4]

9. The MSA in MDL 2179 requires all such BELO actions to be initially filed in this Court. The MSA, however, also provides that a BELO action may be later transferred to another district court if venue is more appropriate there. MSA, § VIII.G.1.c.

10. BP Defendants are both corporate citizens of Delaware, with their principal place of business in Houston, Texas, and are not citizens of the state in which the Plaintiff currently resides.

11. Plaintiff has properly and timely complied with all condition precedents for a class member who is filing a claim for a LMPC, including, but not limited to, the pre-suit notice and the obtaining of an election not to mediate from the BP Defendants.

12. The Northern District of Florida is the most appropriate venue. Plaintiff worked during her clean-up operations for the Oil Spill in Florida. While working as a Clean-Up Worker, Plaintiff was exposed to oil, other hydrocarbons, and other substances released from the MC252 Well and/or the Deepwater Horizon and its appurtenances, and/or dispersants and/or decontaminants used in connection with her Response Activities.[5] Moreover, Plaintiff's current place of residence is in Lynn Haven, Florida, 32444. Lastly, Plaintiff's witnesses and other relevant sources of proof, such as treating doctors, are also located in the Northern District of Florida. Considering the relative ease of access to sources of proof, the ability to secure attendance of witnesses, and the ability to minimize costs of witnesses, the appropriate venue for this cause of action is the Northern District of Florida.

---

[4] MDL Rec. Doc. No. 8218 (approval order), MDL Rec. Doc. No. 6427-1 (MSA § XXVII); *see also*, MDL Rec. Doc. No. 14099 (BELO CMO).
[5] *MSA*, § VIII.G(3)(b)(iii).

**GENERAL FACTS**

**I.   Response Activities Exposed Plaintiff to Numerous Toxic Chemicals.**

13. The Oil Spill occurred with the blowout of the Macondo Well which was drilled by the Deepwater Horizon Rig (DHR) on the outer continental shelf in the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana.

14. The explosions and fire on board the DHR occurred on or about April 20, 2010.

15. Crude oil and other hydrocarbons were released following the explosion.

16. This crude oil contained benzene and other volatile organic compounds ("VOCs") such as ethylbenzene, toluene, xylene and naphthalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead, and zinc.

17. Crude oil, which as described above contains chemicals such as benzene, PAHs, and many other chemicals that are toxic, move from the oil into the air. Once airborne, these chemicals and/or gasses, with pungent petroleum like odors, can blow over the ocean for miles, reaching communities far from the location of the Oil Spill.

18. Subsequently, Response Activities were performed by Clean-Up Workers under the direction of Unified Command.

19. As part of its response to the *Deepwater Horizon Incident*, BP Defendants directed the use of vessels to, *inter alia*, recover oil coming to the surface of the Gulf of Mexico; skim oil from the surface of the water; and conduct in-*situ* burning of oil that reached the surface of the water. BP Defendants also employed vessels to tow and deploy booms—floating barriers intended to contain, deflect, or hold back oil floating in the water's surface.

20. As part of this effort, both onshore and off-shore Clean-Up Workers, as well as residents, came into contact with crude oil, dispersants and oil/chemical mixtures as they worked and slept.

21. Additionally, as part of the Response Activities, BP Defendants purchased highly noxious chemical dispersants from Nalco and/or its subsidiaries, including COREXIT. These dispersants were applied over large areas using various methods, including but not limited to, spraying from airplanes, spraying from vessels, and subsea injection.

22. COREXIT contains hazardous substances and is harmful to human health. The substances in COREXIT are known to cause numerous health conditions, including, but not limited to: acute and chronic physical and neurological conditions and diseases; respiratory and pulmonary conditions; cardiological conditions; adverse central nervous system effects; ocular conditions; dermal conditions; gastrointestinal conditions, liver and kidney effects, damage to developing fetuses; and various forms of cancers and metastatic diseases.

23. Consequently, on May 20, 2010, the U.S. Environmental Protection Agency ("EPA") directed Defendants to identify a chemical dispersant less toxic than COREXIT within 24 hours and begin using it within 72 hours.

24. On May 20, 2010, Defendants objected to this order and notified the EPA that it would continue using COREXIT.[6]

---

[6] Defendants' use of COREXIT skyrocketed (BP used 45,000 gallons on May 22, 2010 and 70,000 gallons on May 23, 2010). Defendants only stopped using COREXIT EC9527A on or about May 23, 2010, when supplies ran out and thereafter relied on COREXIT EC9500.

25. According to the Aerial Dispersants Operations – Houma Status Report, by July 19, 2010, Defendants had ordered the application of nearly one million[7] gallons of dispersant covering approximately 291 square miles of the Gulf.

26. In response to criticism regarding Defendants' use of COREXIT in the Gulf, BP's Group Chief Executive at the time and former CEO, Bob Dudley, defended the use of COREXIT, stating that "the toxicity of COREXIT is about the same as dish soap, which is effectively what it is and how it works."[8] He further misrepresented the danger by stating that the Gulf of Mexico is "an ecosystem that's used to oil. So oil on the water is not something new."

27. Clean-Up Workers were often directly exposed to COREXIT as aerial spray planes both recklessly and intentionally sprayed chemical dispersants on the water despite the presence of VOO and other boats in the vicinity whose crews were performing offshore clean-up work, thereby misting or spraying Clean-Up Worker boat crews with these toxic dispersants. Further, near-shore and beach Clean-Up workers were sprayed with COREXIT as the winds from the south would often blow it off the Gulf and onto the beaches.

28. Clean-Up Workers, whether working onshore or offshore, reported that they were provided minimal or no personal protective equipment on the job. Additionally, Defendants would often threaten Clean-Up Workers with termination when they tried to wear respirators or additional safety equipment on the job.[9]

---

[7] The exact amount of 972,880 gallons. *See* Houma ICP Aerial Dispersant Group. After Action Report Deepwater Horizon MC252 Aerial Dispersant Response. (December 31, 2010).

[8] K. Savage, BP Head Bob Dudley Defends Dispersant Use, as Gulf Coast Communities Speak Out at Shareholder Meeting (Apr. 17, 2013), available at http://bridgethegulfproject.org/blog/2013/bp-head-bob-dudley-defends-dispersant-use-gulf-coast-communities-speak-out-shareholder.

[9] For example, BP believed that allowing workers to wear respirators would "scare the tourists" and create a negative public image.

29.     Defendants hired a consultant called Center for Toxicology and Environmental Health ("CTEH") to perform Industrial Hygiene monitoring during the post-spill response. BP Defendants had knowledge that CTEH was incentivized to under-report the health and safety side of the Deepwater Horizon Spill since it was paid to ensure regulatory compliance for its clients by finding the least protective rules and regulations and relying on those for its monitoring and sampling plans.[10]

30.     At all times relevant to this litigation, BP knew or should have known that: (a) crude oil and dispersants contain chemicals hazardous to human health; (b) Clean-Up Workers like Plaintiff herein were entitled to adequate and timely warning of the harmful effects of exposure to crude oil and chemical dispersants and the hazardous substances that crude oil and dispersants contain; (c) Clean-Up Workers should have been provided adequate personal protective equipment when engaged in Oil Spill clean-up activities; and (d) Clean-Up Workers should have been provided adequate safety training.

31.     BP, aware of the risks that Clean-Up Workers would face, failed to warn Clean-Up Workers of the risks of exposure to the oil and dispersants; failed to provide adequate respirators and protective gear/clothing; failed to provide adequate safety training; and ignored worker safety concerns, even in the face of OSHA warnings and notification by the U.S. Department of Health

---

[10] Essentially, BP's hiring of CTEH amounted to the "fox guarding the chicken coop" since CTEH was an interested non-party hired by Defendants to find that chemicals of concern in the air were not present at unsafe levels. See Schor, E. (2010, June 18). Record of BP's Gulf Worker-testing firm raises conflict-of-interest questions. Greenwire. https://archive.nytimes.com/www.nytimes.com/gwire/2010/06/18/18greenwire-record-of-bps-gulf-worker-testing-firm-raises-84788.html. On June 25, 2010, Representatives Capps and Welch issued a letter to BP requesting that BP must "[r]emove CTEH from their role as primary monitor of health issues" and "[e]nlist an independent, well-respected toxicology center to take over this role and ensure valid and reliable public health monitoring" because of CTEH's long history of questionable practices of releasing findings "defending the corporate interests that employ them."

and Human Services that vessel workers in its VOO program, as well as other offshore and onshore Clean-Up Workers, were complaining of illnesses after being exposed to oil and dispersants.

II. **BP Found to be Liable by the Courts and Multiple Government Agencies for the Oil Spill in the Immediate Aftermath of the Response Activities.**

32. The Oil Pollution Act of 1990 ("OPA") imposes liability upon a "responsible party for a . . . facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702. After the Oil Spill, the U.S. Coast Guard designated BP as a "responsible party" under the OPA.

33. Following an exhaustive investigation into the cause of this enormous disaster, a White House commission faulted BP and its partners for a series of cost-cutting measures that led to insufficient safety systems. In November 2012, BP pled guilty to 11 counts of manslaughter and one felony count of lying to Congress[11], for which the oil giant agreed to pay billions in criminal fines, penalties and restitution.

---

[11] "[T]he felony obstruction of Congress charge reflects the fact that the defendant's criminal conduct extended beyond the events surrounding the blowout itself to the defendant's untruthful post-spill conduct in understanding the scope of the ensuing oil spill to Congress… BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD…On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent 'pressure data was obtained from the BOP stack.' At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010" *See* Guilty Plea Agreement at 1, U.S. v. BP Exploration & Production, Inc., No. 2:12-CR-00292 (E.D. La, Nov. 15, 2012), ECF No. 2.

34. On September 4, 2014, the Honorable Carl Barbier, Presiding Judge for the Eastern District of Louisiana, ruled in the Clean Water Act trial that BP was primarily at fault for the Oil Spill because of its gross negligence, willful misconduct, and recklessness. (*U.S. v. BP Exploration & Production, Inc., et al.*, Findings of Fact and Conclusions of Law, Phase I, No. 10 – 4536 in MDL 2179, Doc. 13381-1, at pp.121–130, 135-136, 152).[12]

35. BP Defendants have already stipulated that Class Members (including Clean-Up Workers) were "exposed" to oil, and other hydrocarbons, and other substances released from the MC252 WELL and/or the *Deepwater Horizon* and its appurtenances, and/or Dispersants and/or decontaminants used in connection with the Response Activities.[13]

36. BP Defendants are at fault for the Oil Spill and *Deepwater Horizon Incident*.[14] Since BP Defendants have stipulated to fault and this is equivalent to negligence, BP Defendants are responsible for any and all damages that were proximately caused as a result of this event,

---

[12] *U.S. v. BP Exploration & Production, Inc*. included the United States' claim for civil penalties against BP Exploration, Inc. and BP American Production Company (defendants herein) and other entities contracted with BP on the Deepwater Horizon under Section 311(b) of the CWA, 33 U.S.C. section 1321(b) and OPA.

[13] *See* MSA § VIII.G(3)(b)(iii); § VIII.G(4) ("the BP defendants shall, following the filing of the BACK-END LITIGATION OPTION LAWSUIT, enter into appropriate stipulations to effectuate the provisions of Section VIII.G.").

[14] MSA § VIII.G(3)(b)(ii).
> For purposes of a MEDICAL BENEFITS SETTLEMENT CLASS MEMBER'S BACK-END LITIGATION OPTION LAWSUIT against a BACK-END LITIGATION OPTION DEFENDANT for a LATER-MANIFESTED PHYSICAL CONDITION . . . the following issues, elements, and proofs of a MEDICAL BENEFITS SETTLEMENT CLASS MEMBER'S BACK-END LITIGATION OPTION LAWSUIT against a BACK-END LITIGATION OPTION DEFENDANT for a LATER-MANIFESTED PHYSICAL CONDITION need not be proven and may not be litigated at trial . . . ii) The alleged fault of BP for the DEEPWATER HORIZON INCIDENT.

including, but not limited to any and all damages caused to class members who allege a "Later Manifested Physical Condition."[15]

37. Plaintiff further incorporates by reference and adopts as if set forth herein the Medical Class Action Complaint previously filed in *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 in the U.S. District Court for the Eastern District of Louisiana, as of April 16, 2012, in Civil Action No. 12-cv-968.[16] Plaintiff also incorporates by reference and adopts as if set forth herein the MSA.

## CAUSES OF ACTION

38. Plaintiff incorporates by reference all prior allegations as though fully set forth herein.

39. During all relevant times, Plaintiff was a Clean-up Worker performing Response Activities, including, but not limited to shoreline clean-up for Contaminant Control from approximately May 2010 to July 2010, and for Hallmark Industrial Services from approximately July, 2010 to September, 2010. Plaintiff would work approximately 7 days a week for up to twelve hours per day on a typical workday. During her Response Activities, Plaintiff was occasionally provided with latex gloves, a mask and a hard hat. Plaintiff had several different duties during this

---

[15] Section § VIII of the MSA titled Back -End Litigation Option For Later Manifested Physical Conditions is a misnomer. This title is a reference to a previous draft of the MSA which made reference to the date of manifestation as the important factor when differentiating Specific Physical Conditions and Later "Manifested" Conditions. However, subsequent drafts changed this language from date of *manifestation* to date of *diagnosis*. The revised language required the Notice of Intent to Sue and materials therewith must be submitted to the Claims Administrator within 4 years of either the **first diagnosis** of that Later Manifested Physical Condition or the Effective Date, whichever is later. Eventually, the final draft of the MSA contained this language of date of diagnosis. However, the title to the section was never changed to comport with the final language of the MSA. Therefore, this section should be titled, "Later Diagnosed Physical Conditions." *See* MSA § VIII.
[16] Medical Class Action Complaint, No. 12-cv-968, Rec. Doc 1.

time period, including, but not limited to, cleaning the beaches in and around Panama City, Florida, disposing of tar bags, removing all tar residue and other chedmicals from boats, booms, anchors, and other equipment. During the relevant times, Plaintiff received continuous exposure to BP's toxic substances through her oil spill clean-up and response work activities.

40. The MSA stipulates to the fact that this Plaintiff, a Class Member, was exposed to oil, other hydrocarbons, and other substances released from the MC252 Well and/or the Deepwater Horizon and its appurtenances and/or Dispersants and/or decontaminants used in connection with Response Activities need not be proven or litigated at trial.[17]

41. While performing Response Activities as a Clean-Up Worker, Plaintiff was exposed to and came into contact with oil, other hydrocarbons, chemical dispersants, and other toxic substances when her eyes, nose, mouth, and skin, and airways were exposed.

42. As a result of this exposure, Plaintiff was diagnosed with a series of respiratory conditions, including but not limited to, Bullous Lung Disease on November 17, 2017. Plaintiff's exposure during the time she worked as a Clean-Up Worker for the Oil Spill was a substantial contributing cause of the above listed medical condition(s).

43. As a result of Plaintiff's exposure, Plaintiff has developed a reasonable fear that in the future she may develop a severe disease, injury, or illness, including, but not limited to

---

[17] MSA § VIII.G(3)(b) ("the following issues, elements, and proofs . . . against a [BELO Defendant] for a Later- Manifested Physical Condition need not be proven and may not be litigated at trial . . . the alleged fault of BP for the *Deepwater Horizon* Incident; and . . . [e]xposure . . . to oil, other hydrocarbons, and other substances released from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances, and/or dispersants and/or decontaminants used in connection with the Response Activities.").

cancer(s) arising out of, resulting from, and/or relating to Plaintiff's Later-Manifested Physical Condition.[18]

44.  Plaintiff has suffered, and will continue to suffer, physical, mental and emotional injuries and damages from his exposure to dangerous chemicals, including, but not limited to, physical injuries and diseases; accompanying physical, mental and emotional pain, suffering and anguish; the need for medical monitoring; costs and inconvenience of obtaining past and future medical treatment for exposure to chemicals; risk and fear of developing future diseases and dying from same; becoming saddled with financial burden; inconvenience; and emotional strain of monitoring his compromised health.

45.  As a result of the Plaintiff being diagnosed with a variety of medical conditions which were proximately caused by her exposure during the clean-up efforts, including but not limited to, Bullous Lung Disease, Plaintiff CAROLYN LEVERETTE-RODRIGUEZ, has suffered the following damages:

    a. Past and future medical expenses;
    b. Past lost wages;
    c. Future lost earning capacity;
    d. Past and Future mental anguish and pain and suffering;
    e. Scarring and disfigurement;
    f. Other economic loss;
    g. Loss of enjoyment of life;
    h. Fear of future medical issues including cancers; and
    i. Pre-judgment interest.

Moreover, Plaintiff seeks any and all damages or relief that this Honorable Court deems just and proper.

46.  Plaintiff requests a trial by jury.

---

[18] MSA § XVI A(3).

WHEREFORE, Plaintiff prays that the BP Defendants by duly cited to appear and answer this Complaint and that this Honorable Court grant Plaintiff relief to which she is entitled to under the law and against BP Defendants, including court costs and compensatory damages.

Respectfully Submitted,

*/s/ C. David Durkee*
**C. DAVID DURKEE, ESQ.**
FL BAR NO: 998435
THE DOWNS LAW GROUP, P.A.
3250 Mary Street, Suite 307
Coconut Grove, Florida 33133
Telephone (305) 444-8226
Facsimile: (305)-444-6773
Email: ddurkee@downslawgroup.com

*/s/ Dylan Boigris*
**DYLAN BOIGRIS, ESQ.**
FL BAR NO: 127282
THE DOWNS LAW GROUP, P.A.
3250 Mary Street, Suite 307
Coconut Grove, Florida 33133
Telephone (305) 444-8226
Facsimile: (305)-444-6773
Email: dboigris@downslawgroup.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct going of the foregoing instrument was filed with the Clerk of Court by using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the Court's electronic filing system. Dated this 4th day of May 2022.

*/s/ Dylan Boigris*
Dylan Boigris